UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

UNITED STATES *ex rel.*
    BONNIE ELSDON,

       *Qui tam* Plaintiff,

    v.

U.S. PHYSICAL THERAPY, INC.; U.S. PHYSICAL
THERAPY, LTD.; THE HALE HAND CENTER,
LIMITED PARTNERSHIP, LLC; REHAB
PARTNERS #2, INC.; and SUZANNE HALE,

       Defendants.

_____/

**Filed under seal
pursuant to 31 U.S.C. § 3729
*et seq.***


JURY TRIAL DEMANDED

## PLAINTIFF'S COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732
## OF THE FEDERAL FALSE CLAIMS ACT

The United States of America, by and through *qui tam* relator Bonnie Elsdon

("Relator"), brings this action under 31 U.S.C. § 3729, *et seq.*, ("False Claims Act" or

"FCA" or "Act") to recover all damages, penalties and other remedies established by the

False Claims Act on behalf of the United States from the named Defendants.

    **I.**     **Preliminary Statement**

    1.     This is an action to recover damages and civil penalties on behalf of the

United States of America ("USA" or "Government") for violations of the False Claims Act

arising from false or fraudulent records, statements or claims, or any combination thereof,

knowingly made, used or caused to be made, used or presented, or any combination thereof,

by U.S. Physical Therapy, Inc. ("USPT"), U.S. Physical Therapy, Ltd; The Hale Hand

Center Limited Partnership, Inc., ("Hale"), Rehab Partners #2, and Suzanne Hale,

collectively "Defendants", their agents, employees, or co-conspirators, or any combination

thereof, with respect to false or fraudulent claims for payment for outpatient occupational

therapy and rehabilitation services provided to individuals for which claims were made by Defendants, acting in conspiracy, to the federal Medicare program and or the Tricare program; and Defendants knowingly using, making and presenting, or causing to use, make or present false records or statements to get false or fraudulent claims paid by the United States from Medicare Trust Funds or Tricare funds.

      2.     Defendants charged for treatment given in groups as though it were given individually in order to charge the Government an inflated rate for the services. Defendants carried out this fraud by, *inter alia*:  1) requiring therapists to code incorrectly in treatment notes; 2) requiring therapists to "co-sign", falsely indicating that the co-signing therapist was providing treatment in order to make it appear as though the actual treating therapist, who was in fact treating a Medicare or Tricare patient simultaneously, was treating that Medicare or Tricare patient solely, contrary to fact; 3) creating false records of treatment times to make it appear as though patients, who were in fact seen together and simultaneously, were treated at different times; 4) "downcharging" commercial patients, *i.e.* certifying that they were treated for less time than they actually were, in order to avoid group charging for Medicare and or Tricare patients treated at the same time; and 5) having unqualified and uncertified front desk personnel who do not treat patients certify to treatment of patients with commercial insurances in order to avoid group charging for other Medicare and or Tricare patients treated at the same time by the same therapist.  Defendants engaged in these schemes to fraudulently obtain payment for services at a higher amount than what they were authorized to receive by federal statutes and Medicare and Tricare rules, policies and regulations, and for services not covered by Medicare or Tricare.

3.      The False Claims Act was enacted during the Civil War.  Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization.  Congress intended that the amendments create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the Government's behalf.

4.      The False Claims Act provides that any person who knowingly presents, or causes the presentment of, a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, and attorney's fees.

5.      The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for herself and the Government, and to share in the recovery.  The Act requires that the complaint be filed *in camera* and remain under seal for a minimum of 60 days (without service on the defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.  As required by the Act, at 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States and to the United States Attorney for this District prior to filing this Complaint, a written disclosure of substantially all material evidence and information relating to the Complaint. This disclosure supports the allegations that Defendants are knowingly defrauding the Medicare Program by false and

3

fraudulent "upcoding"[1] of claims for outpatient occupational therapy services and by false and fraudulent billing for group services to Medicare patients as if the patients had received individual services from licensed occupational therapists ("OTs") and occupational therapist assistants ("OTAs"). Defendants engaged in these false and fraudulent billing practices in order to obtain higher payments of Medicare Trust Funds and/or Tricare funds than the lower amounts to which they were entitled by federal statutes and Medicare and/or Tricare rules, policies and regulations, and to obtain payment for services not reimbursable by Medicare or Tricare.

6.     Under Medicare and Tricare, health care professionals and entities, including licensed occupational therapists and operators of licensed occupational therapy facilities, all have specific responsibilities to prevent false claims from being presented and are liable under the False Claims Act for their role in the submission of false claims. This is an action for treble damages and penalties for each false claim and each false statement under the False Claim Act, 31 U.S.C. § 3729, *et seq.*, as amended.

## II.     Parties

7.     Relator is a citizen of the United States, resident of Florida, licensed Occupational Therapist by the State of Florida, and former employee of Hale at its outpatient facility located in Rockledge, Florida.

---

[1] "'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *United States ex rel. Bledso v. Cmty. HealthSys., Inc.*, 342 F.3d 634, 637 n.3 (6th Cir. 2003).

8.      Relator brings this action on behalf of the United States pursuant to 31 U.S.C. § 3730(b)(1), and Relator is an "original source" as defined by 31 U.S.C. § 3730(e)(4)(B).

9.      On information and belief, U.S. Physical Therapy, Inc. is a domestic corporation.  Its principal address is 1300 W. Sam Houston Parkway, Ste. 300, Houston, Texas 77042.

10.      On information and belief, USPT, directly or through wholly-owned subsidiaries, co-owns and co-operates over 500 outpatient physical and occupational therapy clinics ("clinics" or "centers") in the United States.  USPT provides the billing systems and directs billing procedures for these clinics.

11.      On information and belief, U.S. PHYSICAL THERAPY, LTD. is a limited partnership organized under the laws of Texas.  Its principal address is 1300 W. Sam Houston Parkway, Ste. 300, Houston, Texas 77042.

12.      On information and belief, Rehab Partners #2, Inc. is a domestic corporation organized under the laws of Texas.  Its principal place of business is 1300 W. Sam Houston Parkway, Ste. 300, Houston, Texas 77042.

13.      On information and belief, Hale is a limited partnership organized under the laws of Texas.  Its principal place of business is 1300 W. Sam Houston Parkway, Ste. 300, Houston, Texas 77042.  It has been doing business in Florida as a foreign limited partnership since 1999.  On information and belief, its Medicare provider number is 686585.

14.      Defendant Suzanne Hale is a Florida resident.

15. On information and belief, Defendant USPT owns Defendant U.S. Physical Therapy, Ltd., which owns 64% of Hale.   Defendant Suzanne Hale owns 35% of Hale. Defendant Rehab Partners #2, Inc. owns 1% of Hale.

### III. Jurisdiction and Venue

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1355, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

17. This Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. §3732(a) because this section authorizes nationwide service of process and because Defendants have at least minimum contacts with the United States, and can be found, reside, transact or have transacted business in this judicial district.

18. This action may be brought in this judicial district under 31 U.S.C. § 3732(a) because at least one Defendant can be found, resides in, and/or transacts business in this District, and because acts proscribed by 31 U.S.C. § 3729 occurred in this District. Additionally, this action may be brought in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### IV. Applicable Law

A. Medicare

19. The Medicare program is a federally funded health care benefit and insurance program operating in interstate commerce designed to provide medical care to

people sixty-five (65) years of age or older, and certain others with covered disabilities or illnesses.  The Medicare program is divided into two parts: Hospital Insurance (Part A) and Medical Insurance (Part B).  Medicare Part A pays for inpatient care in a hospital or a skilled nursing facility.  Medicare Part B pays for, among other things, occupational therapy, outpatient physical rehabilitation services and diagnostic testing.  This case deals with fraudulent billing practices involving Medicare Part B for outpatient occupational therapy and rehabilitation services.

20.     Medicare Part B program pays eighty percent (80%) of the reasonable charge of medically necessary services provided by a licensed occupational therapist or a licensed occupational therapist assistant working under the supervision of an occupational therapist.  The patient's secondary private health insurance, Medicaid or the patients themselves are responsible for the remaining twenty percent (20%) co-payment balance.

21.     The Medicare program is prescribed by statute and federal regulations and is supervised by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services (CMS), formerly known as the Healthcare Financing Administration (HCFA).

22.     The Medicare Part B program is administered in Florida by the Agency for Health Care Administration ("AHCA") pursuant to a contract with the United States Department of Health and Human Services.  AHCA receives, adjudicates and pays claims submitted to the Medicare program from providers of medical services, including the claims of Defendants as described herein.

23.     In order to receive payment, a provider is required to submit a paper Form CMS-1500 or its electronic claim equivalent.  Once received, the Medicare program

7

assigns each claim a claim control number and pays, denies or requests further information about the claim.  Medicare claim forms require the provider to certify that the information on the claim form is truthful.

24.     Once the Medicare program reviews and adjudicates a claim, it then pays a provider by check mailed to the provider or by electronically wiring funds to the provider's designated bank account.

25.     The Medicare program requires the health care provider to describe the services rendered by using a Current Procedure Terminology ("CPT") code on patient forms.  The CPT code is an annual publication by the American Medical Association designed to provide a common classification of services for health care providers.

26.     The CPT codes typically utilized by providers of outpatient occupational therapy services are set forth on Exhibit A, attached hereto and incorporated herein by reference. Exhibit A shows the code number for each diagnostic test, procedure or modality typically used by an occupational therapy professional; describes each diagnostic test, procedure or modality; and shows Florida Medicare payment rate for each diagnostic test, procedure or modality.

27.     Because some CPT codes provide for higher payment rates than others, a dishonest and fraudulent health care provider can increase the total amount of its reimbursements by assigning patients to higher payment CPT codes than warranted or permitted under controlling rules, policies and regulations.  For example, CPT code 97150 (group therapeutic procedures—an untimed code) provided a payment rate of $18.21 per session, whereas CPT code 97110 (individual treatment) provided a payment rate of $30.48 per 15-minute unit of time.  If a provider improperly assigned CPT code

97110 rather than CPT code 97150 on a regular basis this would result in a significant and unwarranted windfall to the provider, and a concomitant financial loss to the payor of the healthcare services, such as the Government under the Medicare or Tricare program.   The intentional assignment of higher paying CPT codes in order to increase the total amount of reimbursements is a form of upcoding and fraud.

B.  Tricare

28.     The Tricare program is a managed health care program established by the Department of Defense for military service members and their dependents. 10 U.S.C. §§ 1071-1110.  It is administered by the Defense Health Agency.  Prior to October 1, 2013, it was managed by the Tricare Management Activity under the authority of the Assistant Secretary of Defense for Health Affairs.

29.     Tricare's regulations prohibit fraudulent and abusive billing relationships, which are "incidents and practices which may directly or indirectly cause financial loss to the Government." 32 C.F.R. § 199.9(b).  Amongst the improper billing practices that it prohibits is charging in excess of those charges routinely charged to other health benefit entitlement programs for the same or similar service.  32 C.F.R. § 199.9(b)(2).

C. The False Claims Act

30.     The FCA provides, in pertinent part, as follows:

(a) Liability for certain acts.  (1) In general. Subject to paragraph (2), any person who—
(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . .

9

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $ 5,500 and not more than $ 11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. For purposes of this section –

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim" –

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government -- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor- licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  31 U.S.C. § 3729.

31.     Since March 23, 2010, the Social Security Act, at 42 U.S.C. § 1320 a-7k(d), has required health care providers who receive or retain federal health care program overpayments to report and return the overpayments within 60 days of identification of said overpayments.  A health care provider who receives or retains federal health care

10

program funds in violation of this provision and other similar statutes and regulations must return such funds as overpayments.  A failure to timely return such overpayments is subject to a reverse false claim under the FCA.

### V.   Fraudulent Conduct

32.   This action alleges that Defendants received unwarranted windfalls in the form of reimbursements from Medicare and Tricare by charging for treatment given in groups as though it were given individually.  Defendants accomplishing this by, *inter alia*: 1) requiring therapists to code incorrectly in treatment notes; 2) requiring therapists to "co-sign", falsely indicating that the co-signing therapist was providing treatment in order to make it appear as though the actual treating therapist, who was in fact treating a Medicare or Tricare patient simultaneously, was treating that Medicare or Tricare patient solely, contrary to fact; 3) creating false records of treatment times to make it appear as though patients, who were in fact seen together and simultaneously, were treated at different times; 4) "downcharging" commercial patients, *i.e.* certifying that they were treated for less time than they actually were, in order to avoid group charging for Medicare and or Tricare patients treated at the same time; and 5) having unqualified and uncertified front desk personnel who do not treat patients certify to treatment of patients with commercial insurances in order to avoid group charging for other Medicare and or Tricare patients treated at the same time by the same therapist.  This action further alleges that the United States Medicare Program and Tricare program have suffered losses as a result of Defendants' fraudulent upcoding and false billing.  The Relator seeks to recover the overpayments to Defendants so that these payments can go back to the United States and to obtain civil penalties against Defendants.

11

33.     Defendants knowingly submitted and presented materially false claims to the Medicare and Tricare programs, and used false records and statements to support those false claims.  All of the Defendants have knowingly presented, or caused to be presented, materially false and fraudulent claims for payment to federal health care benefit programs, specifically Medicare, in violation of 31 U.S.C. § 3729(a)(1)(A), as set forth herein.  All of the Defendants have knowingly made, used or caused to be made or used, one or more materially false records or false statements material to a false or fraudulent claim to federal health care benefit programs, specifically including Medicare and Tricare, in violation of 31 U.S.C. § 3729(a)(1)(B).  All of the Defendants have knowingly made, used or caused to be made or used, one or more materially false records or false statements material to an obligation to pay or transmit money or property to the federal Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the federal Government, including the federal health care benefit programs Medicare and Tricare, in violation of 31 U.S.C. § 3729(a)(1)(G) and 32 C.F.R. § 199.9 (b)(2), as set forth herein.  All of the Individual Defendants have knowingly conspired and combined to commit, with themselves and others, and have knowingly aided and abetted each other in the commission of, violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) as more fully set forth in this Complaint, all in violation of 31 U.S.C. § 3729(a)(1)(C).

34.     At all times relevant to this complaint, Bonnie Elsdon was a duly licensed occupational therapist (OT).  Ms. Elsdon primarily worked at Hale at its center in Rockledge, Florida, from March 4, 2015 to March 2018.  She was trained for 3 months in the Melbourne office, and then moved over to the Rockledge office.  From then on, she

12

would fill in at the Melbourne office intermittently, as needed.  She has knowledge of the billing practices at both facilities, as well as the common billing procedures of USPT.

35.     As part of her usual and customary duties as an OT at Hale, Ms. Elsdon was required to designate in the patient's chart the CPT codes for the patient services that she provided and the amount of time in 15-minute units that she treated each patient.  The CPT codes, the number of units of treatment and the times the total treatment time and total time-based treatment time were each recorded on the patient's "encounter note" that Hale used as part of the patient's chart.

36.     At the end of each day, Ms. Elsdon and the other therapists who worked for Defendants submitted the completed treatment encounter note with the number of units for a particular CPT code to be billed to the front office personnel.  The front office personnel were responsible for entering the billing portion of the treatment encounter note into the Raintree Electronic System and the paper version was filed together with the others for a specific day.  USPT's billing department would then review and submit final billing claims to Medicare and Tricare.

37.     While at Hale, Ms. Elsdon provided occupational therapy treatments to numerous Medicare and Tricare patients.  Along with the other employees of Defendants, she was instructed that if she treated two or more patients at the same time, that she should avoid using the CPT code for group therapeutic procedures (97150) if at all possible for the Medicare or Tricare patient, but rather should use the CPT codes for one-on-one services.  Ms. Elsdon was informed that the CPT code 97150 for group billing was highly discouraged because of the low reimbursement rate.

38.     In fact, it was not until February 2016 that OTs working for Defendants were even informed of the existence of the group therapy designation.  It was presented as a new billing code that had just gone into effect.  Prior to February 2016, the group billing code was not being used by Defendants despite the fact that Defendants had been treating patients in group settings.  Relator has first hand knowledge that it was not being used from the date of her hire in March 2015 through February 2016, despite the fact that the group therapy code had, in fact, been in existence for years.  *See e.g. U.S. ex rel. Strickland v. Drayer*, Case No. 13-cv-1781 in the United States District Court for the District of South Carolina.  Since it was Relator and her therapist colleagues that would have had to correct any incorrect prior treatment records so that they could be correctly billed, and they were never asked to do so, Relator is certain that Defendants never corrected for the fact that it did not charge for group billing at all prior to February 2016.

39.     The overbilling was not inadvertent, but intentional.  That Defendants intended to avoid the group billing code by creating false records is evidenced by a change that Defendants implemented on the daily treatment note contemporaneous with informing the OTs working for Defendants of the existence of the group therapy designation.  The daily treatment note prior had a space to record "time in" and "time out".  When the existence of the group charge was revealed, these entries were removed from the daily treatment note, apparently so that these notes would not show actual times in and times out that would document the fact of group treatment.  This omission allowed other records of times in and out, which could more readily be manipulated as described herein, to be the only records of those times.

40.     Defendants routinely sought and obtained reimbursement from Medicare for treatments provided by a therapist to a Medicare or Tricare patient during the same time unit that the therapist was treating other patient(s), which treatment should have been billed as group therapeutic procedures, but were billed at the higher reimbursement rates for one-on-one treatments.

41.     Ms. Elsdon was further informed that the CPT codes for one-on-one services were timed codes and were billed to Medicare based on the number of 15-minute units of time spent in providing skilled services to the patient.  For Medicare reimbursement purposes, providers billed a single 15-minute for a procedure greater than or equal to 8 minutes through and including 22 minutes.  If the duration of a single procedure is greater than or equal to 23 minutes through and including 37 minutes, then 2 units are billed; if 38 minutes to 52 minutes, then 3 units are billed and so on.   This procedure for counting minutes for timed CPT codes in 15-minute units is commonly referred to as the Medicare "8-Minute rule."  The 8-Minute rule dictates that in order to bill for each additional time-based code, a provider must spend at least eight minutes of each unit providing direct service to the patient.  In other words, in order to bill for a 15 minute code, Medicare requires that the session be at least eight minutes long of uninterrupted service.  For 2018, the reimbursement rate in Florida for one-on-one therapeutic exercises (CPT code 97110) was $30.48 per 15-minute unit.  The reimbursement rates for other time-based codes (for one-on-one treatment) are set forth on Exhibit A, CPT codes 97110 to 97140, and 97530 to 97542.

42.     Defendants were aware of the Medicare 8-Minute rule.  They routinely displayed charts and reminders in the centers describing the 8-Minute rule so that staff

15

would use the 8-Minute rule when preparing the claims for reimbursement for Medicare patients.

43.     If in 2018 Ms. Elsdon provided therapeutic exercise to a Medicare patient for 45 minutes as part of a group, a reimbursement claim should have been submitted to Medicare for $18.21 for the services provided to the patient.  However, if the same Medicare patient was provided therapeutic exercises for 45 minutes on a one-on-one basis, the claim submitted to Medicare would have been for $91.44 ($30.48/unit x 3 units). Medicare would have therefore been billed $73.23 ($91.44 - $18.21) more than if the service had been billed to Medicare at the group code rate

44.     Under CMS/Medicare regulations, rules and policies, the group billing code must be used whenever a Medicare patient is treated simultaneously with another patient, and both treatments required the presence of a therapist.

45.     Under CMS/Medicare regulations, rules and policies, a provider may not bill for an OT's services in the same time unit for more than 1 one-on-one treatment code for services provided to the same or to different patients. As a result of Medicare regulations, rules, and procedures the maximum number of units an OT or OTA may routinely bill for one-on-one treatment during any interval of time equal to or greater than 53 minutes through 67 minutes is 4 units regardless of whether the one-on-one treatment is provided to the same or different patients.

46.     While employed at Hale, Ms. Elsdon was informed by Suzanne Hale and Whitney Greene, who acted as Ms. Elsdon's immediate supervisor, to avoid using the group billing CPT code (code 97150) for Medicare patients even though Hale routinely treated Medicare patients simultaneously with other patients.   Relator's superiors

instructed her and other therapists to document falsely to achieve the goal of avoiding group billing codes.

47.     Ms. Elsdon initially believed that her supervisors would not do anything illegal.  Further, she was not aware of what was and was not submitted to the Government.

48.     Nonetheless, Relator voiced concern to Whitney Greene about the incorrect coding alleged herein.  Whitney Greene told Ms. Elsdon that the only way to keep paying all of the staff was to continue these billing practices and reassured Ms. Elsdon that they were being thorough in their efforts to create records that would prevent any issue with the Government.  Approximately two days later, Whitney Greene told Relator that she had discussed the issue with her counterpart at the Melbourne facility, whose name is Suzy Carroll, and Whitney Greene reported that Suzy Carroll told her that they did the same thing at the Melbourne facility.  Suzanne Hale also stated to Ms. Elsdon on multiple occasions that co-signing without truly co-treating would be "okay" since they are all in the same room and that using the group charge would make it very hard for her to keep paying her staff.  On information and belief, Suzanne Hale in fact knew that co-signing without co-treating was not legal.

49.     These statements confirmed to Relator that the incorrect codes that the therapists were recording were in fact being used to bill the Government, and that the procedure was company-wide.  Further, she realized that the only possible purpose of the incorrect coding was to submit false claims to the Government; that the documents incorrectly stating the treatment times and/or containing incorrect CPT codes were submitted to the Government, and/or that they were being used as backup support for false claims that were regularly being submitted to the Government.

17

50.     From her position inside the business, Relator took steps to further understand the billing process; to document that false submissions were being made; to document the scope and frequency of the fraudulent activity; and to confirm and further understand the fraudulent means that Defendants employed.

51.     Relator discovered that Defendants employed a number of ruses to falsely document that multiple patients who had been seen in a group setting (*i.e.* by the same therapist at the same time) had been seen individually.  She determined that their visits had been falsely recorded and falsely coded on a regular basis.  She resigned her position, and arranged for the filing of this lawsuit.

52.     Because Relator herself was made to produce documents that were false, and to put incorrect codes on treatment notes, she has first hand knowledge of the facts alleged herein.  In addition, she has personally seen, and has produced to the Government, copies of documents showing the various versions that documents went through in order to create false documentation to be presented to the Government, as well as documents that are normally destroyed that show the actual times that patients were treated and show that, in fact, they were seen in group settings.

53.     More specifically, Relator provides documents showing dual record-keeping by the Defendants.  These include daily schedule printouts that have handwritten edits exhibiting the process that Defendants went through to falsely document treatment times while keeping track of what was actually happening, so that they would know who actually was coming in when.  *See* Exhibits B-D.  She provides these along with hand-

written sign-in sheets that usually show the actual treatment times[2].  *Id.*  Relator observed how the front desk personnel, including Kolleen Ottivego, kept track of all the different versions of the schedule.  When they made appointments, if a patient wished to come in at a time that overlapped with another patient, they would place the client on the "official" schedule at a time that did not overlap, including after 5:00 p.m., when the center was closed.  The front desk personnel would print a working version of the schedule, and hand-write on it the actual time of the appointment so that the therapists would know when the person was actually coming in.  Relator also observed instances in which the front desk personnel would tell the patient there was no need to sign in, so that the front desk personnel could sign in falsely for the patient at a time that that did not overlap.  Relator also provides an example of an Appointment Card given to a patient (*see* Exhibit C), showing the appointment time that was entered into in the computerized system, and then the hand-written edits to that document that provided the correct time so that the patient would know to come in at the correct time.  The electronic document and system would never show the actual treatment time; it would state (falsely) that the patient came at a time that did not overlap with other patients.  At the end of the day, Defendants would submit the electronic version showing no overlaps for billing purposes.  She also provides an example of an Upload Summary.  *Id.*

54.    Relator resisted the fraud.  She specifically instructed the front desk personnel to record correct times for patients she treated.  But Relator's instructions were overridden by Whitney Greene, who was acting on the instructions of her superiors.

---

[2] The sign in sheets were sometimes falsified as well.

55.     There is no conceivable reason for any of the ruses alleged herein –requiring therapists to code falsely, requiring therapists to cosign falsely, and maintaining an "official" but false schedule that does not show the actual treatment times – other than to fraudulently overcharge the United States Government.

56.     The billing records of three representative days display this and other of the ruses Relator observed.  They also provide documentary evidence of specific instances of false claims and false statements.

**DECEMBER 11, 2017**

57.     On this day, as the records attached in Exhibit B show, at 8:00 a.m. patient A.A., a Medicare patient, started treatment and overlapped with S.L., a patient with private insurance, for 25 minutes of treatment.   According to the express instructions of Defendants, Whitney Greene indicated falsely on the billing records that Relator Bonnie Elsdon co-treated for this overlapped time.  Medicare should have been billed 2 units of therapeutic exercise and 1 unit of group therapy for patient A.A.  Instead, Medicare was billed 4 units of therapeutic exercise.  The amount of overbilling can be expressed as follows:

> 2 TE and 1 Gr. = (2 x $32.55) + (1 x $17.41) = $82.51
> A.A. was actually billed:
> 4 TE = (4 x $32.55) = $130.20
> Difference: $130.20 – $82.51= $47.69

58.     On this same day at 10:00 a.m. patient J.H., who had workers' compensation insurance, started treatment and was seen for 50 minutes of treatment.  Whitney Greene falsely cosigned stating co-treatment had occurred for 20 minutes. Bonnie Elsdon treated J.H. at the same time that she treated R.B. (who started treatment at 10:30 a.m.), a Medicare

patient.  R.B. should have been billed 1 unit of group therapy.  Instead, R.B. was billed 2

units of therapeutic exercise.  The amount of overbilling can be expressed as follows:

> 1 Gr. = $17.41.
> R.B. was actually billed:
> 2 TE = (2 x $32.55) = $65.10.
> Difference: $65.10 - $17.41 = $47.69

59.     On this same day at 12:00 p.m., Patient J.C., who has private insurance,

started treatment that lasted approximately 50 minutes.  Because the therapists were

instructed by Defendants to only bill 2 units to Aetna patients despite how much time they

were actually treated, Patient J.C. was only billed 1 evaluation for 20 minutes and 1

therapeutic exercise for 15 minutes, as well as a splint DME charge for a total of 35

minutes.  A.J., a Medicare patient, started treatment at 12:30 p.m. but was falsely placed

on the original version of the schedule at 6:00 p.m.  She signed in at 12:25 p.m., but

defendants crossed that out on the sign in sheet.  A.J. was seen for 55 minutes, from 12:30

to 1:25 p.m..  (The final version of the schedule moved her "official" treatment time to 3:00

p.m..) Patient D.W. started treatment at 1:00 p.m. and was seen for 40 minutes of one-on-

one treatment and 10 minutes of group at the end of session.  A.J. and D.W., both Medicare

patients, were seen at the same time of overlap for 25 minutes.  A.J. should have been billed

1 unit of group therapy, 1 unit of manual therapy and 1 unit of therapeutic exercise.  Instead,

A.J. was billed 3 TE and 1 MT.  The amount of overbilling can be expressed as follows:

> 1 Gr. + 1 MT + 1 TE = $17.41 + $29.98 + 32.55 = 79.94
> A.J. was actually billed:
> 3 TE + 1 MT = (3 x $32.55) +$29.98 = $97.65 + $29.98 = $127.63.
> Difference: $127.63 - $79.94 = $47.69.

60.     Meanwhile, D.W. was billed 2 units of Iontophoresis, 1 MT, and 1 Group. D.W. should have been billed 1 MT and 1 Group. The amount of overbilling can be expressed as follows:

> 1 MT + 1 Gr. = $29.98 + $17.41= $47.39.
> D.W. was actually billed:
> 2 Io + 1 MT and 1 Gr. = (2 x $21.82) + $29.98 + $17.41 = $91.03.
> Difference: $91.03 - $47.39 = $43.64.

61.     As the above information and documents show, for the services rendered at the Rockledge, Florida facility on December 11, 2017, Defendants overbilled the U.S. Government $187.61.

62.     There were other schedule manipulations of note on December 11, 2017. As the records attached in Exhibit B show, at 3:50 p.m. Patient L.P., a Medicare Health Plan[3] patient, checked in.  According to the express instructions of Defendants, Whitney Greene and/or the front desk personnel falsely moved L.P. on the computerized schedule to show a treatment start time of 5:00 p.m.  (The clinic is not open after 5:00 p.m. on Mondays).  L.P. was seen for 55 minutes of treatment, which also overlapped with J.B., another Medicare Health Plan patient, who started treatment at 4:00 p.m. and was seen for

---

[3] Under Medicare Health Plans and Medicare Advantage plans, sometimes called "Part C", Medicare pays a fixed amount for a patient's care each month to a private company. Relator understands that the private insurer, not the Government, is billed for patient services. Thus, Relator has excluded these patients' charges from the calculation of false claims damages herein, yet has included the examples for three reasons.  First, private companies offering such plans must follow rules set by Medicare; there could be a false certification or other violation concerning these falsely documented and falsely coded Part C patients. Second, their overcharging at a minimum indirectly harms the Government by driving up the costs of Part C plans.  Third, Relator could be incorrect, and the government could be the payor, or the payor of a pass through charge, that the incorrect coding has rendered false.  Finally, these instances could be examples of over inclusion by Defendants who were so motivated to avoid group coding on Medicare Part B that they avoided group coding altogether for any Medicare-related plan.

5 minutes of heat therapy and 25 minutes of treatment.  Assuming Medicare billing rules apply to L.P., L.P.'s insurer should have been billed 1 unit of therapeutic exercise and 1 unit group therapy.  Instead, L.P.'s insurer was billed 3 units of therapeutic exercise and 1 unit of therapeutic activity.

Assuming Medicare Part B rates apply to Medicare Part C, the amount of overbilling can be expressed as follows:

> 1 TE + 1 TA + 1 Gr. = \$32.55 + 34.80 + \$17.41 = \$84.76
> L.P. was actually billed:
> 3 TE and 1 TA = (3 x \$32.55) + (1 x \$34.80) = \$97.65 + \$34.80 = \$132.45
> Difference: \$132.45 - \$87.46 = \$47.69

63.     Meanwhile, Patient J.B., also a Medicare Health Plan patient was billed 2 units of therapeutic exercise.  Assuming Medicare billing rules apply to J.B., J.B.'s insurer should have been billed 1 unit of group therapy.

Assuming Medicare Part B rates apply to Medicare Part C, the amount of overbilling can be expressed as follows:

> 1 Gr. = \$17.41
> J.B. was actually billed:
> 2 TE = 2 x \$32.55 = \$65.10.
>  Difference: 65.10 - 17.41 = \$47.69.

**JANUARY 31, 2018**

64.     On this day, as the records attached in Exhibit C show, at 8:00 a.m., patient J.P. a Tricare patient, arrived and received 10 minutes of heat therapy and then was billed for 55 minutes (4 units) of therapeutic exercise (a one-on-one treatment) for a total time of 65 minutes.  M.O., a patient with private healthcare coverage, came in at 8:42 a.m. and received 5 minutes of heat therapy (which is non-billable time) and was billed 50 minutes (4 units) of therapeutic exercise.  According to the express instructions of Defendants, OT

Whitney Greene indicated on M.O's note that she delegated 20 minutes of treatment to OT Bonnie Elsdon in order to avoid group charging; however, OT Whitney Greene actually treated both patients at the same time.  Tricare should have been charged 2 units of therapeutic exercise for Patient J.P and 1 unit of group therapy.  Instead, Medicare was billed 4 units of therapeutic exercise. The amount of overbilling can be calculated as follows:

> 2 TE and 1 Gr. = (2 x $30.48) + (1 x $18.21) = $60.96 + $18.21 = $79.17
> J.P. was actually billed:
> 4 TE = 4 x $30.48 = $121.92
> Difference: $121.92 - $79.17 = $42.75

65.     On this same day, patient M.B. was treated at 1:30 p.m.  However, both the computer schedule printed on January 30 and attached in Exhibit C states that she was scheduled for treatment at the end of the day, at 5:00 p.m.  In fact, her appointment was always for 1:30 p.m., as is reflected in the handwritten correction in her Appointment Card, also attached in Exhibit C.  The records of her treatment were altered in order to avoid group charging for her treatment at 1:30 p.m.  She did not actually sign in that day. Defendants instructed the front desk personnel to offer to sign patients in to the sign-in sheet and instructed front desk personnel to falsify the sign-in records to avoid group therapy.  Defendants also saw an opportunity to manipulate the schedule so that it read that she came in at 4:00 p.m. (which is more believable than after hours), and so made that final edit to the "official" schedule, as is shown in the version printed on January 31 at 4:43 p.m. and attached hereto in Exhibit C.  Medicare should have been charged 1 unit of therapeutic exercise and 1 unit of group therapy for Patient M.B.  Instead, Medicare was billed 3 units of therapeutic exercise.  The amount of overbilling can be calculated as follows:

1 TE and 1 Gr. = (1 x $30.48) + (1 x $18.21) = ($30.48) + ($18.21) =
$48.69
M.B. was actually billed:
3 TE= 3 x $30.48 = $91.44
Difference: $91.44 - $48.69 = $42.75

66.     On this same day, as the records attached in Exhibit C show, patient T.B.m,

a Veteran's Administration ("VA") patient began treatment at 2:00 p.m.  M.B. was still

being treated until 2:20 p.m.  Other patients also arrived and began treatment by the same

OT while T.B. was being treated.  But OT Whitney Greene, acting according to the

instructions of Defendants, reported on the records of those patients that treatment was

delegated to a "healthcare extender", the front desk personnel, who in fact did not aide in

their treatment, in order to avoid a group charge for patient T.B.  VA should have been

charged 1 unit of therapeutic exercise and 1 unit of group therapy for Patient T.B.  Instead,

VA was billed 4 units of therapeutic exercise. The amount of overbilling can be calculated

as follows:

1 TE and 1 Gr. = (1x $30.48) + (1 x $18.21) = ($30.48) + ($18.21) =
$48.69
T.B. was actually billed:
4 TE= 4 x $30.48 = $121.92
Difference: $121.92 - $48.69 = $73.23

67.     On this same day, as the records attached in Exhibit C show, patient A.M.,

who has private insurance, was treated for one hour, but his insurance was only billed for

one unit (10 minutes) in order to create a false record that showed no overlap with a

Medicare patient, A.K. Patient A.M. was actually treated for approximately 55 minutes,

including 5 minutes of heat, which overlaps A.K.'s treatment by 25 minutes. Whitney

Greene provided a Moderate Complexity Evaluation for 15 minutes, simultaneously during

this overlap of treating A.M.   Medicare rules do not allow for evaluations to be done in a

group setting.  Thus, Medicare should not have been billed a one-on-one Evaluation Moderate Complexity charge (CPT code 97166) for Patient A.K.  However, Medicare was billed 1 unit of Evaluation Moderate Complexity and DME.  The amount of overbilling can be calculated as follows:

> A.K. was actually billed:
> 1 Mod Eval = $89.80
> Difference: = $89.80

68.     That same day at 2:30 p.m**.**, Patient M.D., who has private insurance, started with 5 minutes of heat and treated for 53 minutes (total time was 58 minutes). Then, at 3:00 p.m., Patient L.K., who has Tricare, started treatment with 5 minutes of heat and treated for 25 minutes.  This overlapped by 23 minutes.    L.K. should have been billed 1 unit of group therapy.  Instead, L.K. was billed 2 units of therapeutic exercise. The amount of overbilling can be expressed as follows:

> 1 Gr. = $18.21
> L.K. was actually billed:
> 2 TE = 2 x $30.48 = $60.96.
> Difference: $60.96 - $18.21= $42.75

69.     As the above information and documents show, for the services rendered at the Rockledge, Florida facility on January 31, 2018, Defendants overbilled the U.S. Government $291.28.

70.      On this same day, as the records attached in Exhibit C show, at 11:00 a.m., patient L.P., a Medicare Health Plan patient[4], began treatment with OT Whitney Greene. Because she was also treating patient P.J. at the same time, Whitney Greene, acting according to the express instructions of Defendants, requested that Relator co-sign as

---

[4] Medicare Health Plans are explained *supra*.

treating P.J for 25 minutes; however OT Whitney Greene actually treated both patients at the same time.  Assuming Medicare billing rules apply to L.P., L.P.'s insurer should have been charged 1 unit of therapeutic exercise for Patient L.P..  Instead, L.P.'s insurer was billed 3 units of therapeutic exercise.

Assuming Medicare Part B rates apply to Medicare Part C, the amount of overbilling can be calculated as follows:

> 1 TE = (1 x $30.48) = $30.48
> L.P. was actually billed:
> 3 TE= (3 x $30.48) = $91.44
> Difference: $91.44 - $30.48 = $60.96

71.     On this same day at 8:30 a.m., Patient J.H., who has private insurance, started with 5 minutes of heat therapy and treated for 50 minutes. Then Patient N.C., a Medicare Health Plan patient, started treatment at 9:00 am and was billed for 55 minutes of treatment.  This overlapped by 20 minutes of which Whitney Greene, acting according to instructions of Defendants, cosigned, falsely indicating co-treatment, when Bonnie Elsdon actually treated both patients at the same time. Patient N.C.'s insurer should have been billed 2 units of therapeutic exercise and 1 unit of group therapy.  Instead, Patient N.C.'s insurer was billed 4 units of therapeutic exercise.

Assuming Medicare Part B rates apply to Medicare Part C, the amount of overbilling can be calculated as follows:

> 2 TE + 1 Gr. = (2 x $30.48) + ($18.21) = $79.17
> N.C. was actually billed:   4 TE = 4 x $30.48 = $121.92
> Difference: $121.92- $79.17= $42.75

## MARCH 2, 2018

72.     On this date at 7:00 a.m., as the records attached in Exhibit D show, Patient A.N., a Tricare patient, started treatment with 10 minutes of dry whirlpool and then treated for 40 minutes.  Meanwhile, Patient O.J., who has private insurance, was seen at 7:10 a.m. and started with 10 minutes of dry whirlpool and treated for 40 minutes.  This overlaps by 30 minutes of treatment. Whitney Greene documented as though Patient A.N. waited until her appointment time at 7:30, even though she started both treatments as soon as they arrived.  Whitney Greene also instructed Bonnie Elsdon to cosign for patient O.J., even though Whitney Greene actually treated both patients simultaneously.  A.N. should have been billed 1 dry whirlpool, 1 ultrasound, and 1 unit of group therapy.  Instead, A.N. was billed 1 dry whirlpool, 1 ultrasound, 1 therapeutic exercise, and 1 therapeutic activity. The amount of overbilling can be expressed as follows:

> 1 DW + 1U + Gr = \$18.79 + \$13.34 + \$18.21 = \$50.34
> A.N. was actually billed:
> 1 DW + 1U + 1 TE + 1 TA = \$18.79 + \$13.34 + \$30.48 + \$40.07 = \$102.68.
> Difference: \$102.68 - \$50.34= \$52.34.

73.     The same day at 8:00 a.m. patient J.C., who has commercial insurance, started treatment with 10 minutes of dry whirlpool and was then treated for 40 minutes. Patient S.V., a Tricare patient, began treatment at 8:30 a.m. with 5 minutes of heat and treated for 40 minutes.  Whitney Greene instructed Bonnie Elsdon to co-sign for 40 minutes of treatment even though Whitney Greene actually treated both patients simultaneously. Patient S.V. should have been billed 2 units of therapeutic exercise and 1 unit of group therapy.  Instead, Patient S.V. was billed 3 units of therapeutic exercise. The amount of overbilling can be expressed as follows:

28

2 TE + 1 Gr. = (2 x $30.48) + $18.21 = $79.17
S.V. was actually billed:
3 TE = 3 x $ 30.48 = $91.44.
Difference: $91.44 - $79.17 = $12.27.

74.     The same day at 2:30 p.m., Patient L.P., who has Medicare, started a 30 minute treatment.  Patient T.B., a VA patient, was also still being treated until 2:40 p.m.. At 2:45 p.m., Patient D.H, who was a self-paying patient, started treatment with 10 minutes of dry whirlpool and then 25 minutes of therapeutic exercise.  Patient L.P. was placed falsely on the schedule at 4 p.m. to avoid the group charge.  In fact, the clinic closed at 4 p.m. that day.   L.P. was treated for 15 minutes of therapeutic exercise and 15 minutes of manual therapy.  This treatment overlapped with the treatment of D.H. by 15 minutes, and with the treatment of T.B. by 10 minutes.  T.B. was charged a group charge accurately, but because it overlapped with L.P. by 10 minutes, L.P. should have been charged a group charge as well.  L.P. should have been billed 1 unit of manual therapy and 1 unit of group therapy.   Instead, L.P. was billed 1 unit of therapeutic exercise and 1 unit of manual therapy. The amount of overbilling can be expressed as follows:

1 Gr. + 1 MT = $18.21 + 27.58 = $45.79
L.P. was actually billed:
1 TE + 1 MT = $30.48 + $27.58 = $58.06.
Difference: $58.06- $45.78 = $12.27.

75.     That same day, at 10:30 a.m., Patient J.T., who has private insurance, began evaluation and treatment for total of 60 minutes.  Meanwhile, Patient M.T., who has Medicare, began treatment at 11:00 a.m. with 10 minutes of dry whirlpool and 40 minutes of treatment.  This overlapped by 20 minutes with Patient J.T.  Acting on Defendants'

instructions, Whitney Greene cosigned falsely[5]; Bonnie Elsdon actually treated these two patients simultaneously.  M.T. should have been billed 1 dry whirlpool, 1 group therapy, and 1 manual therapy.  Instead, M.T. was billed 1 dry whirlpool, 2 units of therapeutic exercise, and 1 unit of manual therapy. The amount of overbilling can be expressed as follows:

> 1 DW + 1 Gr. + 1 MT = $18.79 + $18.21 + $27.58= $64.58
> M.T. was actually billed:
> 1 DW + 2 TE + 1 MT = $18.79 + (2 x $30.48) + ($ 27.58) = $107.33.
> Difference: $107.33 - $64.58= $42.75

76.     The same day at 1:50 p.m., Patient D.S., who has coverage through the Veterans Administration arrived.  He began treatment at 2:00 p.m.; however the front desk assistant overwrote his sign in time so that it said "2:30" on the sign in sheet and added a note stating that he "arrived early but waited for appointment".  (Due to the fact that the next patient had signed in at 2:30, 2:30 was the latest time that it could be believable that he had arrived and signed in).  He was falsely placed on the schedule at 3:30 p.m..  Patient D.S. had 5 minutes of heat and then 20 minutes of electronic stimulation, both of which are unattended time.  He then had 38 minutes of treatment for a total time of 63 minutes.  T.D., who is insured by United Healthcare, began treatment at 2:30 p.m. and received 10 minutes of ultrasound and 25 minutes of iontophoresis for a total of 35 minutes.  Only 15 minutes of treatment was noted as instructed by Defendants because of a practice of not billing United Healthcare patients who overlapped with patients insured by Government healthcare.[6]  The actual overlap in treatment was 33 minutes.  D.S. should have been billed

---

[5] Because this occurred the following day, Relator is not in possession of the documentation showing the co-sign.  It should be in the Defendants' documentation.
[6] The billing records for February 13, 2018, which also exhibit the practice of not billing United Healthcare patients who overlapped with patients insured by Government programs, is attached hereto as Exhibit E.

1 unit of electronic stimulation and 1 unit of group therapy.  Instead, D.S. was billed 1 unit of electronic stimulation, 1 unit of ultrasound, 1 unit of therapeutic exercise, and 1 unit of manual therapy. The amount of overbilling can be expressed as follows:

> 1 ES + 1 Gr. = \$15.43 + \$18.21 = \$33.64.
> D.S. was actually billed:
> 1 ES + 1U + 1 TE + 1 MT = \$15.43 + \$13.34 + \$30.48 + \$27.58 = \$86.83.
> Difference: \$86.83- \$33.64= \$53.19.

77.     As the above information and documents show, on or about March 2, 2018, Defendants overbilled the U.S. Government \$172.82 for services rendered at the Rockledge, Florida facility.

**Defendants' Knowledge and Intent**

78.     It was impossible that the management of Defendants was unaware of the manipulation of the schedule to avoid group billing.  For example, on numerous occasions, the schedule would show treatment of patients after the clinic had closed in order to avoid patient overlap.  Exhibits B, C and F attached hereto contain a number of these fraudulent schedules showing patient treatment during hours that the clinic was closed.

79.     The underbilling of certain private insurers also reveals that Defendants' overbilling of the Government was intentional.  Therapists were instructed to charge one or two time units to private insurers whose patients were seen for many more.  On reflection, Relator realizes that the only reason to do this would be to not to show an overlap with Medicare or Tricare patients seen at the same time, and thereby charge the Government a higher rate for these patients than allowed.  *See* Exhibit E.

80.     The deliberate nature of the billing practices is also revealed by the practice of the front desk personnel crossing out and changing the Appointment Cards.  Examples of this practice are attached in Exhibit G.

81.     The deliberate nature of the fraudulent billing practices is also revealed by a group billing handout, created by Defendant USPT, and attached hereto as Exhibit H, and its specific instructions to avoid overlapping that would result in lower group charges to Government healthcare providers.  After going through all the steps employees should take to avoid overlapping, it advises as follows:  "If you do overlap, licensed therapists need to be open to delegating patients to other therapists/assistants to allow for best coding options."  This statement makes clear that even in cases of overlap, that the therapists were to avoid the group charge, which, of course, could only be achieved by a false statement. The Defendants' goal was, by hook or by crook, to not allow the Government the advantages of group charging.  Examples of false delegations are attached hereto as Exhibit I.  (That said, there were instances in which the manipulation of the "official" schedules discussed herein could not be used to avoid group charging.  In those cases, Defendants billed group therapy appropriately).

82.     Also leaving little doubt that the practices were known and intentional, in addition to the improper coding already discussed, *supra*, the false recordkeeping at the front desk was also occurring at the Melbourne facility.  Suzy Carroll informed Relator that they manipulated the front desk schedule at the Melbourne office as well.

83.     Based on Relator's actual work experience at Defendants, her knowledge of their billing practices and procedures and record keeping procedures, and a review of documents created and altered in the billing process, Relator concludes that Defendants

violated Medicare and Tricare regulations, rules and policies on a daily basis by upcoding Medicare and Tricare patients by utilizing one-on-one CPT codes when in fact Medicare and Tricare patients were treated in groups and by having unlicensed therapists cosign as though they provided treatment to privately insured individuals who were in fact being co-treated along with Medicare and Tricare patients.

### USPT's Control

84.     Defendant U.S. Physical Therapy, Inc. supervised and administered billing for the Hale Hand Center, Inc. and, more importantly, demanded that facilities that it had an ownership interest in, such as Hale, employ the fraudulent practices described herein to inflate bills.

85.     At the end of each day, the OTs at the Hale Hand Center would turn in their daily notes and billing sheets for the entire day to Kolleen Ottivego or Isaac Bermudez. These two individuals would compile the billing sheets and enter the billed amount for each patient.  They would also make note of the copay collected from each patient.  The compiled information would then be entered onto a computer form in a software program called "Raintree".

86.     A file with all of the billing sheets the therapists had turned in and the receipts from copays would be given to Debra Yanelli, who would create summary forms of the days' billing, including the fraudulent entries described above.  The financial summary forms would then be uploaded to the USPT portal.

87.     USPT would then submit the fraudulent bills to Medicare.

88.     USPT continually monitored the billing of Hale Hand Center and pushed it to maximize billing.  USPT employee Vicki Whitaker, who held the title of Business Office

Liaison and worked out of USPT's offices in Houston, Texas, was in frequent contact with Debra Yanelli and Whitney Greene, instructing them on billing.

89.     For example, in the second half of 2017, Relator overheard a call between Whitney Greene and someone at USPT.  In that call, Ms. Greene was explaining her charges to someone at USPT.  Ms. Greene mentioned to Relator after the phone call that the person from USPT was questioning her about whether or not she had maximized her charges.  In the call, Ms. Greene was having to justify why she charged certain lower charges.

90.     Likewise, in 2017 Ms. Greene attended a management training session at USPT in Texas, and returned with instructions to bill the procedures that reimbursed the most.

91.     USPT employee Vicki Whitaker also visited the Melbourne and Rockledge clinics to train the office staff, particularly Debra Yanelli, on the Raintree system.  Further USPT employees regularly came to the Hale clinics and performed internal audits, after which they would give Whitney Greene, Debbie Yanelli and Sue Hale feedback.

92.     USPT employee Vicki Whitaker also trained front desk personnel Kolleen Ottivego and Isaac Bermudez, who had hands on responsibility for the sign-in sheets and "official" schedules.

93.     USPT employee Vicki Whitaker was in frequent contact by telephone from Houston with employees of Hale, instructing them on billing procedures.

94.     USPT also provided written instructions on billing to Hale.  Examples of such are attached hereto as Exhibits H and J.

95.     The above-described practice of underbilling certain private insurers in order to overbill for Medicare and Tricare patients treated simultaneously was also directed by USPT.  The instruction to underbill certain private insurers was made to Relator by Whitney Greene; however Whitney Greene told Relator that the instruction came from Debra Yanelli, who consulted frequently with USPT concerning billing practices.

96.     Further, Debra Yanelli, ostensibly an employee of Hale, in fact was the agent of USPT.  She informed Relator when she moved to the Rockledge office from the Melbourne office in January 2017, that the move was precipitated by the fact that USPT was adding three more clinics, *i.e.* not Hale clinics, to her billing responsibilities.  USPT and Hale were so integrated, and the organizational lines so blurred, that USPT could direct a Hale employee to move office locations in order to perform work for clinics owned by USPT, but not Hale.  When Debra Yanelli directed the false billing practices alleged herein, and when she took actions furthering the false billing conspiracy alleged herein, she was acting as USPT's agent and/or co-conspirator.

97.     Debra Yanelli was privy to the manipulation of the schedule at the front desk as described herein.  She herself sometimes filled in at the front desk.

98.     The instances and documents described herein made clear to Relator that USPT directed the billing practices of Hale Hand Center, that USPT pressured Hale Hand Center to maximize billing, and that USPT provided the specific instructions on how to do so by, for example, falsely co-signing, by underbilling private insurers, and by creating records that did not show overlapping treatment of Medicare/Tricare patients even when it occurred.

99.     At all times relevant hereto, Defendants were aware of CMS/Medicare's requirement to use group coding when treating Medicare patients simultaneously with other patients.  Defendants, through the CMS were provided coding interpretations and billing scenarios illustrating when group billing and one-on-one billing were appropriate. Although Defendants knew of the requirements to use a group billing CPT code when a Medicare or Tricare patient requiring the services of a therapist was treated at the same time with one or more other patients requiring the services of a therapist, they deliberately, knowingly and fraudulently instructed its therapy staff to document incorrectly and its billing staff to overbill Medicare by ignoring the group billing requirements and use only the one-on-one CPT billing codes.

100.     The difference between billing for services based on a group CPT code and on one-on-one CPT code is significant.

101.     Using the representative dates, the Hale Hand Center Rockledge's patient schedule shows that 18 of 40, or 45%, of the billed Medicare or Medicare-related visits for those three days were improperly billed.

102.     Using the 2017 and 2018 payment schedules for Florida (see Exhibit A), and the CPT codes for one-on-one skilled services used by The Hale Hand Center for billing Medicare patients, along with the three representative days, Relator estimates that the Government is being fraudulently overcharged as a result of The Hale Hand Center's fraudulent upcoding in the approximate amount of $217 per day, $1085 per week or $56,420 per year at the Rockledge center alone, and $169,260 per year at the Melbourne center, based on their relative size.   The two centers together are estimated to overbill the Government $225,680 per year.  The Hale Hand Center represents just two of USPT's

36

more than 500 centers.  Upon information and belief, each of USPT's more than 500 centers utilizes some or all of the same billing practices and procedures that the Rockledge center uses, or similar ruses, to avoid group billing.  Each of these centers are submitting the same type of false and fraudulent claims and information to the Government.  As Hale represents only two of the over 500 clinics run by USPT, Relator estimates that USPT overbills the Government in excess of $56,420,000 per year through upcoding.  Exhibit K attached hereto and incorporated herein sets forth how Relator calculated the estimated overcharges stated herein.

103.    Prior to February 2016, when the group billing code was not being used at all by Defendants, the rate of overcharging would likely have been even higher.

104.    In addition to defrauding Medicare and Tricare by upcoding, Defendants have also defrauded Medicare and Tricare by having unlicensed therapists cosign as though they provided treatment to privately insured individuals who were in fact being co-treated along with Medicare and Tricare patients.   From December 2017 through February 2018, Defendants engaged in the practice of having the receptionist, Isaac Bermudez, sign as though he had provided treatment.  In or about February 2018, Defendant Hale announced that she had determined that this was not legal, yet, on information and belief, Defendants did not reimburse the Government for falsely charging it individual rates on the false fact that Isaac had performed the treatment.

105.    The facts, as set forth herein, clearly demonstrate that Defendants, through its officers, center managers and regional vice presidents, acted knowingly as defined in 31 U.S.C. § 3729(b) in that they acted in reckless disregard of the truth or falsity of the information, acted in deliberate ignorance of the truth or falsity of the information, or acted

with actual knowledge that the information Defendants provided on the claims it submitted or caused to be submitted and/or presented to Medicare and Tricare officials for payment were false.  The facts alleged herein clearly demonstrate that Defendants, through their officers, center managers and regional vice presidents, knew that they were fraudulently upcoding or false coding Medicare claims because they were submitting claims for physical and occupational therapy services provided to Medicare eligible patients on a group basis while billing the Medicare program as if the services were provided on a one-to-one basis thereby enabling Defendants to bill Medicare at a higher rate for the services provided than was warranted by federal statutes and Medicare Tricare regulations, rules and policies. These facts demonstrate that Defendants' fraudulent upcoding and false billing were not inadvertent errors, but were a knowing and systemic pattern of causing the presentment of false claims, and using false statements and records containing fraudulently upcoded and false coded claims for payment by Tricare and Medicare officials.

106.    Defendants knowingly made materially false records and false statements in support of such false and fraudulent claims to Medicare and Tricare material to an obligation to pay or transmit money or property to the United States Government, or knowingly and fraudulently concealed and, upon information and belief continue to knowingly and fraudulently conceal an obligation to pay or transmit money or property to the United States Government, or knowingly, fraudulently and improperly avoided or decreased, and continue to knowingly, fraudulently and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government.

107.    The Defendants' foregoing materially false records or false statements include, but are not limited to, Medicare enrollment applications and certifications, EMRs,

EHRs, federal health care benefit program provider agreements and certifications, patient charts, patient encounter forms, daily therapy schedule time sheets, and express and implied certifications and representations in the claims for payment, *i.e.*, CMS Form 1500 and its electronic equivalent (X12 837).

108.     The materiality of the falsity of the claims Defendants caused to be presented for payment by Tricare and Medicare officers and employees and the false statements and records Defendants made and used are for the very purpose of presenting the claims to Tricare and Medicare for payment was for Tricare and Medicare to rely on the information submitted in the claims in order to pay the claims at an amount based on the presumed to be truthful information required to be submitted by Defendants adhering to the requirements of the federal statutes and Medicare and Tricare regulations, rules and policies.     However, Defendants falsified the information stated in its claims and submissions to Tricare and Medicare for the purpose of getting greater amounts of Medicare Trust Funds and Tricare than the amounts to which they were entitled by federal statutes and regulations, rules and policies to receive for the outpatient occupational and physical therapy services that they actually provided to Medicare eligible patients. Therefore, Defendants' false statements and records were material, and knowingly and fraudulently made.

109.     Defendants, from a date on or before March 4, 2015 to the present, knowingly (as defined in 31 U.S.C. § 3729(b)) submitted or caused to be submitted to Medicare reimbursement claims that were based upon violations of the Federal False Claims Act in violation of 31 U.S.C. § 3729 causing substantial damages and loss to the United States' Medicare and Tricare programs.

110.     As a result of Defendants' false and fraudulent claims and schemes as described above, the Government was directly damaged by paying much higher payments for outpatient occupational therapy services than the lower amounts to which Defendants were entitled by federal statutes and regulations, rules and policies to receive.

111.     The Government, unaware of the falsity of the claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid or not be paid at higher amounts but for Defendants' false and fraudulent misrepresentations.

## COUNT I
## VIOLATION OF THE FALSE CLAIM ACT SECTION 3729(a)(1)(A)
## BY CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

112.     This is a civil action by Plaintiff, United States of America, *ex rel*. Relator, Bonnie Elsdon, on behalf of the United States and on behalf of the Relator, against Defendants, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

113.     Relator realleges and incorporate by reference Paragraphs 1-111 as if fully set forth herein.

114.     Defendants, from a date on or before March 4, 2015 to the present, knowingly (as defined in 31 U.S.C. § 3729(b)) submitted to officers, employees, agents or contractor of the United States Department of Health and Human Services or Department of Defense false or fraudulent claims for payment or approval, resulting in great financial loss to the United States of America.

115.     By virtue of the acts described above, Defendants falsely certified their compliance with all applicable statutes, rules, regulations and procedures in connection with the submission of Medicare reimbursement forms from at least March 4, 2015 through the present.

116.     Each claim submitted by and each reimbursement or payment received by Defendants that was a result of a false or fraudulent record or statement and/ or a false or fraudulent claim for payment constitutes a separate violation of the FCA and entitles the United States to recover a civil penalty of $5,500 to $11,000 for each violation.

117.     The Relator estimates that Defendants knowingly false and fraudulent conduct resulted in the Government paying in excess of an extra $80,000,000 per year since March 4, 2015 for false claims prohibited by the FCA statutes, which constitute actual damages, without regard to fines or civil penalties.  Further, on information and belief, Defendants' conduct resulted in the overpayments prior to March 4, 2015 as well.

118.     As a result of Defendants' actions and conduct as set forth in this Count, the United States, on information and belief, has suffered actual damages in excess of $300,000,000, all in violation of 31 U.S.C. § 3729(a)(1)(A).

**COUNT II**
**VIOLATION OF THE FALSE CLAIM ACT SECTION 3729(a)(1)(B)**
**BY CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED**
**TO RESULT IN A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED**
**BY THE GOVERNMENT**

119.     This is a civil action by Plaintiff, United States of America, *ex rel*. Relator, Bonnie Elsdon, on behalf of the United States and on behalf of the Relator, against Defendants, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

120.     Relator realleges and incorporate by reference Paragraphs 1-111 as if fully set forth herein.

121.     Defendants, from a date on or March 4, 2015 to the present, knowingly (as defined in 31 U.S.C. § 3729(b)) caused to be submitted to Medicare reimbursement claims that were based upon violations of the Federal False Claims Act in violation of 31 U.S.C.

§ 3729 causing substantial damages and loss to the United States' Medicare and Tricare programs.

122. By virtue of the acts described above, Defendants have falsely certified their compliance with all applicable statutes, rules, regulations and procedures in connection with Medicare and Tricare reimbursement forms that Defendants caused to be submitted from at least March 4, 2015 through the present.

123. Each claim that Defendants caused to be submitted and each reimbursement or payment that Defendants caused to be received was a result of a false or fraudulent record or statement and/ or a false or fraudulent claim for payment and constitutes a separate violation of the FCA and entitles the United States to recover a civil penalty of $5,500 to $11,000 for each violation.

124. The Relator estimates on information and belief that Defendants' knowingly false and fraudulent conduct resulted in the Government paying in excess of an extra $240,000,000 since March 4, 2015 for false claims prohibited by the FCA statutes, which constitute actual damages, without regard to fines or civil penalties. Further, on information and belief, Defendants' conduct resulted in the overpayments prior to March 4, 2015 as well. Additionally, on information and belief as alleged herein, the fraudulent conduct resulted in losses in years prior.

125. As a result of Defendants' actions and conduct as set forth in this Count, the United States has suffered actual damages in excess of $240,000,000, all in violation of 31 U.S.C. § 3729(a)(1)(B).

## COUNT III
## CONSPIRACY TO VIOLATE THE FALSE CLAIM ACT SECTION 3729(a)(1)(C)

126.     This is a civil action by Plaintiff, United States of America, *ex rel*. Relator, Bonnie Elsdon, on behalf of the United States and on behalf of the Relator, against the Individual Defendants, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

127.     Relator realleges and incorporate by reference Paragraphs 1-111 as if fully set forth herein.

128.     In violation of 31 U.S.C. § 3729(a)(1)(C), all of the Individual Defendants knowingly combined and conspired to violate sections of the FCA, including, but not limited to, 31 U.S.C. § 3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B) and 31 U.S.C. § 3729(a)(1)(G) as set forth above.

129.     In a conspiracy and combination and in furtherance thereof, the Individual Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, materially false and fraudulent claims for payment or approval to the United States – *i.e.*, the foregoing false and fraudulent claims for payments from Medicare -- in violation of 31 U.S.C. § 3729(a)(1)(A), and, upon information and belief, continue to combine and conspire to violate the foregoing sections of the FCA.

130.     In a conspiracy and combination and in furtherance thereof, the Individual Defendants knowingly made, used or caused to be made or used, and upon information and belief continue to make, use and cause to be made or used, materially false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

43

131.     In a conspiracy and combination and in furtherance thereof, the Individual Defendants knowingly made, used or caused to be made or used materially false records or false statements, and upon information and belief continue to knowingly make, use or cause to be made false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly, fraudulently and improperly avoided or decreased, and upon information and belief continue to knowingly, fraudulently and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

132.     During the conspiracy and combination and in furtherance thereof, the conspirators acted knowingly to have the foregoing false and fraudulent claims, statements, and records to be made, used and/or presented, or acted with reckless disregard or deliberate ignorance of whether or not the claims, statements and/or records were false and fraudulent, and, upon information and belief, continue to do so.

133.     As a direct and proximate result of the foregoing combination and conspiracy by, between and among all of the Individual Defendants, who each aided and abetted the other Individual Defendants in furtherance of the conspiracy, and committed overt acts in furtherance of the conspiracy with each false and fraudulent claim submitted to the federal Government, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV
## REVERSE FALSE CLAIMS UNDER THE FALSE CLAIM ACT.
### SECTION 3729(a)(1)(G) CLAIM

134.    This is a civil action by Plaintiff, United States of America, *ex rel*. Relator, Bonnie Elsdon, on behalf of the United States and on behalf of the Relator, against Defendants, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

135.    Relator realleges and incorporate by reference Paragraphs 1-111 as if fully set forth herein.

136.    Defendants knowingly made, used or caused to be made or used false records or false statements, and upon information and belief continues to knowingly make, use or caused to be made false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and upon information and belief continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

137.    These said false records or statements were presented, and upon information and belief continue to be presented, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

101.    As a direct and proximate result of these knowingly false records or false statements by the Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States of America, demands that judgment be entered against Defendants, jointly and severally, for the amount of damages to the United States arising from Defendants' false or fraudulent claims, records or statements as follows:

1.      On Count I for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim presented or caused to be presented.

2.      On Count II for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false statement made or caused to be made.

3.      On Count III for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false statement made or caused to be made.

4.      On Count IV for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false statement made or caused to be made.

5.      Recoupment to the United States Treasury of all Medicare Trust Funds and Tricare funds paid to Defendants in excess of the lesser amounts to which Defendants were entitled by federal statutes regulations, rules and policies.

6.      All fees and costs of this civil action.

7.      For such other and further relief as the Court deems just and equitable.

8.      Further, the Relator requests that she receive thirty percent (30%), (twenty-five percent (25%) if the United States intervenes and proceeds with this case) or such other maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that her percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Respectfully submitted,

**SPAGNOLETTI & CO.**

*/s/ David S. Toy*
David S. Toy
Texas SBN 24048029 / SDTX ID 588699
401 Louisiana Street, 8th Floor
Houston, TX 77002
Telephone:     713 653 5600
Facsimile:      713 653 5656
Email:           dtoy@spaglaw.com

**OF COUNSEL:**

**SPAGNOLETTI & CO.**
401 Louisiana Street, 8th Floor
Houston, TX 77002
Telephone:     713 653 5600
Facsimile:     713 653 5656

**DO CAMPO & THORNTON, P.A.**
John Thornton
Chase Bank Building
150 S.E. Second Ave., Ste. 602
Miami, FL 33131
Telephone:     305 358 6600
Facsimile:     305 358 6601
Email:          jt@dandtlaw.com

***Attorneys for Qui tam Plaintiff***