UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES *ex rel.*
     BONNIE ELSDON,

     *Qui tam* Plaintiff,

     v.

U.S. PHYSICAL THERAPY, INC and THE HALE
HAND CENTER, LIMITED PARTNERSHIP,

     Defendants.

_____/

C.A. No. 4:18-cv-01766

JURY TRIAL DEMANDED

**RELATOR'S RESPONSE IN OPPOSITION TO
MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I. PROCEDURAL HISTORY ...........................................................................................1

II. INTRODUCTION........................................................................................................2

III. STANDARD OF REVIEW ..........................................................................................4

IV. The Complaint States a Claim and Pleads Fraud with Particularity .........................5

   A. Summary of Facts .................................................................................................6

     1. Specific Allegations of Fraud Prior to February 2016. ..................................6

     2. Specific Allegations of Fraud After February 2016. .....................................7

       a. Using false co-signers to overbill Government.........................................8

       b. Falsifying records of treatment time to facilitate overbilling Government. ..............9

       c. Downcharging commercial patients.......................................................11

       d. Unqualified personnel co-signing ..........................................................11

     3. Control and Company-wide Allegations .....................................................11

   B. These Allegations Provide Detail and Indicia of Reliability Satisfying Rules and Precedent ..................................................................................................................13

     1. The Allegations Do Not Describe "Appropriate, Lawful Billing", But Rather Inappropriate, Unlawful Bilking. ...............................................................13

     2. No Equally Plausible Explanations Exist....................................................15

     3. The Notion That USPT Instructed and Encouraged Hale Employees, But Not the Employees at its Other Clinics, to Bill Falsely Defies Plausibility. ............................17

     4. Relators Knowledge, Combined with the Documentary Evidence, Constitute Particularized Allegations Satisfying All Pleading Rules. ..........................17

V. CONCLUSION .........................................................................................................20

i

# TABLE OF AUTHORITIES

**Statutes and Rules**                                                                     **Page(s)**

False Claims Act 3729(b)(2)(A) and (B) ....................................................................18

Fed. R. Civ. P. 12(b)(6)...............................................................................................4

Fed. R. Civ. P. 8(a) .....................................................................................................4

Fed. R. Civ. P. 9(b) ..............................................................................................4, 18

**Cases**                                                                                  **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662, 678, 129 S. Ct. 1937 L. Ed. 2d 868 (2009) ....................................4

*Bankers Trust Co. v. Old Republic Ins. Co.*,
    959 F.2d 677 (7th Cir. 1992) .............................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)..............................4

*U.S. Baylor v. Scott & White Health*,
    2019 WL 3713756 (W.D. Tex. Aug. 4, 2019) ......................................................15

*U.S. ex rel. Bennet v. Medtronic, Inc.*,
    747 F.Supp. 2d 745 (S.D. Tex. 2010) .................................................................15

*U.S. ex rel. Chorches v. Am. Med. Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017).............................................................................18, 19

*U.S. ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ....................................................................4, 5, 17-19

*U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols. In Healthcare, Inc.*,
    No. SA-17-CV-1249-XR, 2019 U.S. Dist. LEXIS 196490 (W.D. Tex. Nov. 13, 2019)..........5

*U.S. ex. rel. Johnson v. Golden Gate Nat'l Senior Care, LLC*,
    223 F.Supp. 3d 882 (D. Minn. 2016)..............................................................13, 14

*U.S. ex rel Strickland v. Drayer Physical Therapy, Institute*,
    No. 13-cv-1781 (D. South Car. 2013)...............................................................2, 7

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
  778 F.supp. 2d 709 (N.D. Tex. 2011) ..................................................................................19


**Other Authorities**
**Page(s)**

U.S. Dept of Justice Press Release: Drayer Physical Therapy Institute, LLC Settle False Claims
  Act Case for $7,000,000 (Available at https://www.justice.gov/usao-sc/pr/drayer-physical-
  therapy-institute-llc-settle-false-claims-act-case-7000000.)…………………………........15

U.S. Physical Therapy, Inc. Form 10-K for the fiscal year ended 12/31/2018 (Available at
  https://www.sec.gov/Archives/edgar/data/885978/000114036119005059/brhc10000168x1_1
  0k.htm#tBUS)........................…………………………………......................................2, 16


**Other Sources**
**Page(s)**

U.S. Physical Therapy Company Overview (Available at https://www.usph.com/about/company-
  overview/)…………………………….................................................................................2

U.S. Physical Therapy LinkedIn Page (Available at https://www.linkedin.com/company/us-
  physical-therapy) ………………….……………..........................................................2

*Qui tam* relator Bonnie Elsdon ("Relator") files this Response to Motion to Dismiss Amended Complaint and Supporting Memorandum of Law by U.S. Physical Therapy, Inc. ("USPT") and The Hale Hand Center, Limited Partnership ("The Hale Hand Center" or "Hale") (D.E. 16) (the "Motion"), stating as follows:

## I.      PROCEDURAL HISTORY

On May 25, 2018, Relator filed the original *qui tam* Complaint (D.E. 1) and served it on the Government on or around May 25, 2018.  Relator filed the Amended Complaint (hereinafter "Complaint") with redacted exhibits on January 23, 2019, after being informed the Government intended to decline intervention, and also filed a Motion to Maintain Seal on Exhibits to Original Complaint on January 25, 2019.  The Government filed its Notice of Election to Decline Intervention on or about January 28, 2019, in which it requested, *inter alia*, that the Court solicit the written consent of the United States before granting or ruling upon any request to dismiss requested by the defendants, and reserved the right to intervene in this action for good cause in the future.

On October 2, 2019, all of the Defendants, through three separate motions, moved to dismiss the action (D.E. 15, motion by Suzanne Hale; D.E. 16, motion by USPT and The Hale Hand Center, and D.E. 17, motion by U.S. Physical Therapy, Ltd., and Rehab Partners #2, Inc.)   On October 29, 2019, Relator filed Plaintiff's Notice of Partial Dismissal Without Prejudice (D.E. 21) dismissing three of the defendants, U.S. Physical Therapy, Ltd., Rehab Partners #2, Inc., and Suzanne Hale, which rendered moot their respective Motions to Dismiss, leaving USPT and The Hale Hand Center (hereinafter "Defendants") as the remaining Defendants in this action.  Their Motion (D.E. 16), is the sole remaining Motion to Dismiss.

1

## II.    INTRODUCTION

Relator alleges that she was hired by The Hale Hand Center in March of 2015. She alleges USPT[1] is the majority owner of Hale.  She alleges she learned through her experience that USPT not only directs Hale's billing practices, but that it directly controls the Hale employees charged with billing, and provides specific instances supporting these allegations.

The Complaint alleges that USPT and The Hale Hand Center conspired to and did charge Government healthcare plans an inflated rate for treatment to patients given in groups by charging as though it had been given individually, violating law and regulation.[2]  Prior to February 2016, Relator alleges Defendants failed to inform their therapists, Relator among them, that there was a different code to be billed for group treatment, even though therapists had long been treating patients in a group setting.  This resulted in known overcharging Defendants never corrected for.  Relator alleges this

---

[1] USPT's business model is to majority own and operate clinics through partnerships. USPT itself professes to "operate" the clinics it has purchased majority interest in.  *See* *https://www.usph.com/about/company-overview/*  "U.S. Physical Therapy is the largest publicly-traded, pure-play operator of outpatient physical and occupational therapy clinics, with over 593 Clinics in 41 States.  Founded in 1990, U.S. Physical Therapy, Inc. *operates* 593 outpatient physical therapy clinics in 41 states" (emphasis added); *see also* https://www.linkedin.com/company/us-physical-therapy "U.S. Physical Therapy is a publicly held company that ***operates*** hundreds of outpatient physical and occupational therapy clinics in over 41 states." (Emphasis added).  In its Form 10k, it states, "Unless the context otherwise requires, references in this Annual Report on Form 10-K to "we", "our" or "us" includes the Company and all of its subsidiaries.  *See* Form 10K at https://www.sec.gov/Archives/edgar/data/885978/000114036119005059/brhc10000168x1_10k.htm#tBUS

[2] These allegations mirror those in *U.S. ex rel Strickland v. Drayer Physical Therapy, Institute*, Case No. 13-cv-1781 in the United States District Court for the District of South Carolina, a case which resulted in a recovery for the Government.

likely occurred before March 2015, but she has direct knowledge that between March 2015 and February 2016, she and her coworkers treated patients, including patients covered by government healthcare plans, in group settings but billed as if they were treated individually. Relator alleges that she and her fellow employees, who in fact had provided group treatment but billed for individual treatment, were never asked to go back and correct for past bills submitted in error.

When informed of the group billing code in February 2016, Relator and her co-workers were instructed to engage in a number of ruses to avoid billing under the group billing code even when group treatment had occurred. As a result, she alleges Defendants continued fraudulently to charge for group treatment as though it were individual, by, *inter alia*: 1) requiring therapists to "co-sign", falsely indicating that the co-signing therapist was providing treatment to make it appear the actual treating therapist, who was in fact treating a Medicare or Tricare patient simultaneously, was treating that Medicare or Tricare patient solely; 2) creating false records of treatment times to make it appear as though patients, in fact seen together and simultaneously, were treated at different times; 3) "downcharging" commercial patients, *i.e.* certifying these patients were treated for less time than they actually were to avoid group charging for Medicare and or Tricare patients treated at the same time; and 4) having unqualified and uncertified non-treating front desk personnel certify they treated patients with commercial insurances to avoid group charging for other Medicare and or Tricare patients treated at the same time by the same therapist. Relator resisted the fraud, but she was overridden by her superiors. She gathered documentation of the fraud to present it to the Government, and resigned.

### III.    STANDARD OF REVIEW

Defendants move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), 8(a) and 9(b).  The United States District Court for the Western District of Texas recently stated the standard of review for a motion to dismiss a *qui tam* action:

> To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a).  In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993).  To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

> In addition, "a complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185-86 (5th Cir. 2009) ("Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading."). That rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," although the rule permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." FED. R. CIV. P. 9(b). The rule acts "as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner rather than later." *Grubbs*, 565 F.3d at 185.  The Fifth Circuit has given the rule a "flexible" interpretation in the FCA context to help "achieve [the FCA's] remedial purpose." *Id.* at 190.  A complaint can survive by either alleging "the details of an actually submitted false claim" or by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

*United States ex rel. Integra Med Analytics, LLC v. Creative Sols. In Healthcare, Inc.*, Civil Action No. SA-17-CV-1249-XR, 2019 U.S. Dist. LEXIS 196490, at *8-9 (W.D. Tex. Nov. 13, 2019).

## IV. THE COMPLAINT STATES A CLAIM AND PLEADS FRAUD WITH PARTICULARITY

The Motion argues 1) Relator misunderstands[3] the relevant laws and regulations so that Relator complains of allowed "*intermittent* one on one treatment*" (Motion at 9); and 2) Relator does not allege sufficient facts, particularly that the conspiracy extended beyond the Hale Hand Center. Defendants do not argue that Relator fails to allege claims were actually submitted; thus the only question is whether Relator alleges particular details of a scheme to submit false claims. *Grubbs*, 565 F.3d at 190. Relator clearly alleges such a scheme for two periods.

First, for the period before February 2016, Relator alleges despite group treatment, the Government was not billed the lower group rate *at all.* The Motion fails completely to rebut this allegation – either on grounds that it was not well-pleaded or with any other argument. Second, for the period after February 2016, Relator alleges in situations *other than intermittent billing*, Defendants caused the Government to be overbilled by employing ruses. These ruses (and others) are both indicia of fraud that belie the argument Relator describes lawful billing, and provide indicia of reliability. Why else would one record false treatment times or false statements of who was treating if not to avoid treatment overlaps that required group billing? Why else would there be

---

[3] Defendants imply that the rules are so complex as to be beyond comprehension. *See* Motion at n.13.

dual record-keeping?  If the patient sessions were all, in fact, intermittent one-on-one treatment sessions, there would be no need to falsify the times or the therapists, or to falsify records.  The records that Relator provides, which on their face demonstrate manipulation, corroborate, and indicate the reliability of Relator's allegations.

In addition, Relator alleges USPT's role was to direct the billing practices of the over 500 clinics that it majority-owns and operates[4]; alleges specific facts demonstrating USPT controlled the billing personnel of The Hale Hand Center, including moving a member of the staff and directing her to perform work for clinics owned by USPT, but not The Hale Hand Center; and provides documentary evidence demonstrating USPT's company-wide direction on billing issues; alleges specific instances of specific USPT employees directing The Hale Hand Center billing practices; alleges USPT training the front desk personnel who kept the schedules and sign-in sheets; and alleges facts showing USPT conspired with the Hale Hand Center to defraud the Government in the instances provided.

**A.  Summary of Facts**

**1.  Specific Allegations of Fraud Prior to February 2016.**

Defendants' failure to employ the group billing code implicates the most significant allegations in terms of dollar value.  Relator alleges:

> In fact, it was not until February 2016 that OTs working for Defendants were even informed of the existence of the group therapy designation.  *It was presented as a new billing code that had just gone into effect.*  Prior to February 2016, the group billing code was not being used by Defendants

---

[4] USPT's *raison d'être* and the core value-add of its business model, which it uses to attract smaller operations into joint ventures with it, is to provide the operational expertise so that the small clinic owners, usually therapists themselves, can get back to treating patients.

6

despite the fact that Defendants had been treating patients in group settings. Relator has first hand knowledge that it was not being used from the date of her hire in March 2015 through February 2016, despite the fact that the group therapy code had, in fact, been in existence for years. *See e.g. U.S. ex rel. Strickland v. Drayer*, Case No. 13-cv-1781 in the United States District Court for the District of South Carolina. Since it was Relator and her therapist colleagues that would have had to correct any incorrect prior treatment records so that they could be correctly billed, and they were never asked to do so, Relator is certain that Defendants never corrected for the fact that it did not charge for group billing at all prior to February 2016.

Complaint ¶ 38 (emphasis added). The Motion whistles past the graveyard as to this

devastating allegation that, by the most conservative estimates, represents millions of

dollars of overbilling.

**2. Specific Allegations of Fraud After February 2016.**

The Complaint alleges when the group billing code was introduced, Defendants

also took legitimate and illegimate steps to avoid using that code, and used ruses to cover

up when the code was improperly avoided. "Relator's superiors instructed her and other

therapists to document falsely to achieve the goal of avoiding group billing codes."

Complaint ¶ 46. It alleges specific communications, for example:

Nonetheless, Relator voiced concern to Whitney Greene about the incorrect coding alleged herein. Whitney Greene told Ms. Elsdon that the only way to keep paying all of the staff was to continue these billing practices and reassured Ms. Elsdon that they were being thorough in their efforts to create records that would prevent any issue with the Government. Approximately two days later, Whitney Greene told Relator that she had discussed the issue with her counterpart at the Melbourne facility, whose name is Suzy Carroll, and Whitney Greene reported that Suzy Carroll told her that they did the same thing at the Melbourne facility.

Complaint ¶ 48. And,

Suzanne Hale also stated to Ms. Elsdon on multiple occasions that co-signing without truly co-treating would be "okay" since they are all in the

same room and that using the group charge would make it very hard for
her to keep paying her staff.

*Id.*

Relator gathered material to "document that false submissions were being made;
to document the scope and frequency of the fraudulent activity; and to confirm and
further understand the fraudulent means that Defendants employed." Complaint ¶ 50.
Relator's first-hand knowledge and documents support the allegations. As the Complaint
points out,

> Because Relator herself was made to produce documents that were false,
> and to put incorrect codes on treatment notes, she has first hand
> knowledge of the facts alleged herein. In addition, she has personally
> seen, and has produced to the Government, copies of documents showing
> the various versions that documents went through in order to create false
> documentation to be presented to the Government, as well as documents
> that are normally destroyed that show the actual times that patients were
> treated and show that, in fact, they were seen in group settings.

Complaint ¶ 52. Relator gathered and presents records from three separate days that
demonstrate the methods and means employed by Defendants. Complaint ¶¶ 57-77.

### a. <u>Using false co-signers to overbill Government</u>

First, Defendants avoided the group billing code by therapists co-signing without
co-treating. Complaint ¶ 48. For example, on December 11, 2017 group therapy was
conducted, but was not billed. Instead, Medicare was billed for 4 units of therapeutic
exercise at the behest of the Defendants. Complaint ¶ 57. The billing records for this day
falsely indicate that Relator co-treated the therapeutic exercise, allowing the Defendants
to overbill by $47.69. *Id.* Later that day Medicare was again overbilled using this same
method (false co-signing) and for the same amount. Complaint ¶ 58. On January 31,
2018 Medicare was again overbilled when Whitney Greene, at the behest of Defendants,

falsely indicated co-treatment, when Relator actually treated two patients at the same time. Complaint ¶ 71. This resulted in $42.75 in overbilling to Medicare. *Id.* The false cosigning continued on March 2, 2018 when Defendants directed Greene to instruct Relator to cosign for a patent she did not treat. Complaint ¶ 72. This instance resulted in Medicare being overbilled $52.34. *Id.* Later that same day, in another instance of false cosigning Greene billed Medicare for patients she did not treat, resulting in a $42.75 overcharge. Complaint ¶ 75.

  **b. <u>Falsifying records of treatment time to facilitate overbilling Government</u>**

  Second, Defendants falsified treatment times to support overbilling Medicare. *See* Complaint ¶¶ 2, 32, 39, 49, 51, 53-55, 59-63, 65, 66, 68, 72-81.

  More specifically, patient daily treatment notes were altered to eliminate "time in" and "time out" data to allow manipulation of other records showing purported times patients were being treated in order to bill one-on-one treatments instead of the less profitable group procedures. Complaint ¶¶ 39-40. This scheme requires creation of multiple versions of patient treatment schedules, some accurate, some inaccurate depending on the document's purpose. The Complaint at ¶ 53 alleges, and Exhibits B-D show, electronic records of treatment times were manipulated to make the purported treatment (and thus the overbilling) appear feasible from a staffing stand-point. These electronic records would then be printed and altered by hand to reflect the actual treatment times so that the patient would know to come in at the correct time. Complaint ¶ 53. Relator alleges in the Complaint how she observed Hale front desk personnel (who

were trained and supervised by USPT) keeping track of all the different versions of the schedule. Complaint ¶ 53.[5]

The Complaint alleges badges of fraud in the form of false records for which there is no explanation. For example, Defendants recorded patient treatment occurring after 5:00 p.m., when clinics were not even open. Complaint ¶¶ 53, 74, 78. *See also* Exhibits B, C, and F to the Complaint. Another example showing demonstrably false records concerns patient A.J. who was treated at one time, but moved to another on the sign-in sheet, and her name apparently forged. *See* Complaint Exhibit B, sign-in sheet. As with the other falsifications, the Complaint demonstrates how the manipulation of recorded treatment times resulted in Government overcharge. Complaint ¶ 59.

---

[5] The Complaint describes a system of dual record-keeping in detail:

> When they made appointments, if a patient wished to come in at a time that overlapped with another patient, they would place the client on the "official" schedule at a time that did not overlap, including after 5:00 p.m., when the center was closed. The front desk personnel would print a working version of the schedule, and hand-write on it the actual time of the appointment so that the therapists would know when the person was actually coming in. Relator also observed instances in which the front desk personnel would tell the patient there was no need to sign in, so that the front desk personnel could sign in falsely for the patient at a time that that did not overlap. Relator also provides an example of an Appointment Card given to a patient (*see* Exhibit C), showing the appointment time that was entered into in the computerized system, and then the hand-written edits to that document that provided the correct time so that the patient would know to come in at the correct time. The electronic document and system would never show the actual treatment time; it would state (falsely) that the patient came at a time that did not overlap with other patients. At the end of the day, Defendants would submit the electronic version showing no overlaps for billing purposes.

Complaint ¶ 53.

**c. Downcharging commercial patients**

Defendants also overcharged the Government by falsely downcharging time spent treating private insurance patients (particularly those with insurance paying a lesser rate than the Government) to disguise overlap. For example, on March 2, 2018, a privately insured patient was billed for 15 minutes of treatment when treated for 35 minutes so that the Veterans Administration could be overbilled $53.19. Complaint ¶ 76. *See also* Exhibit E (containing records on February13, 2018 of overlapping Whitney Greene patients A.M., a private patient, and D.B., a Government patient. A.M. was billed one unit and recorded as spending only 10 minutes, despite performing a circuit of 7 separate exercises. This freed Whitney Greene to bill the Government 4 individual units for D.B.)

**d. Unqualified personnel co-signing**

Finally, Defendants instructed unlicensed therapists to falsely cosign for providing treatment to privately insured patients so properly licensed therapists could overbill Medicare[6]. Complaint ¶ 104.

In sum, the Complaint alleges that Defendants overbilled Medicare by billing for individual treatment when they believed they could alter the records and schedule to hide the fact that group treatment had occurred, resulting in false claims to the Government. Complaint ¶¶ 37, 39, 41, 43-46, 49, 51, 52, 57-60, 62, 64-68, 70-76, 81-83.

**3. Control and Company-wide Allegations.**

USPT majority owns its over 500 clinics, which, of course, provides it motivation to maximize billing at those clinics. Complaint ¶¶ 10-15. Daily notes and billing sheets

---

[6] This practice allowed Defendants to falsely create the available time in the licensed therapists' schedules in order to overbill Medicare.

are shepherded into a computer-system controlled by USPT. Complaint ¶ 85. Individuals trained and controlled by USPT submit bills to Medicare. Complaint ¶¶ 85-87. USPT continually monitors the billing at Hale, and a USPT employee in Houston instructs Hale employees on billing, and pushed them to maximize billing. Complaint ¶ 88. USPT supervised and specifically pushed to maximize billing. Complaint ¶¶ 89-90. Therapists who were viewed as not charging the maximum plausible amounts were taken to task by USPT. Complaint ¶ 89. Significantly, a USPT employee trained the Hale front desk personnel – the people who maintained the falsified schedules and sign-in sheets. Complaint ¶ 92. The Complaint alleges USPT directed and controlled the billing personnel. Specifically, the Complaint alleges Debra Yanelli, ostensibly an employee of Hale, told Relator that she was moved from one office to another so that she could better serve three of USPT's *other* clinics, not Hale clinics. As the Complaint alleges, "USPT and Hale were so integrated, and the organizational lines so blurred, that USPT could direct a Hale employee to move office locations in order to perform work for clinics owned by USPT, but not Hale." Complaint ¶ 96. This particular employee, tied to USPT, also was privy to the manipulation at the front desk and filled in there. Complaint ¶ 97. The Complaint alleges Yanelli, who consulted with USPT concerning billing, instructed therapists to underbill certain private insurers, one of the alleged ruses for overbilling Government insured patients treated simultaneously with privately-insured patients. Complaint ¶ 95.

The Complaint alleges and documents that USPT not only directed the billing practices of clinics, including Hale and the over 500 others, but pushed them to overbill. Complaint ¶ 94 and Exhibits H and J. For example, Exhibit H to the Complaint was a

broadly-distributed document that gave specific instructions to avoid overlapping patients that would result in lower group charges to Government healthcare providers. The document cautions "If you do overlap, *licensed therapists need to be open to delegating patients to other therapists/assistants to allow for best coding options*." Complaint Exhibit H (emphasis added). The Defendants' actually instruct licensed therapists to utilize "assistants" in order to make the clinics more profitable. *Id.* Relator witnessed this practice first-hand, which resulted in unqualified and uncertified front desk personnel certifying the treatment of patients with commercial insurances to avoid group charging for other Medicare or Tricare patients treated at the same time by the same therapist. Complaint ¶¶ 2, 104. These documents and common sense strongly suggest the practices instituted at Relator's location were a result of a broader scheme by the Defendants. Complaint ¶¶ 78-111.

**B. These Allegations Provide Detail and Indicia of Reliability Satisfying Rules and Precedent.**

**1. The Allegations Do Not Describe "Appropriate, Lawful Billing", But Rather Inappropriate, Unlawful Bilking.**

Defendants argue that the CMS regulations allow for one-on-one treatment when multiple patients are in a clinic at the same time with a therapist. They rely on, and call "highly persuasive", the case of *U.S. ex. rel. Johnson v. Golden Gate Nat'l Senior Care, LLC*, 223 F.Supp. 3d 882 (D. Minn. 2016). (Motion at 8). In *Johnson*, the Court was faced with, *inter alia*, allegations of charging for individual treatment when group therapy had been given. The defendant filed a motion for summary judgment. The Court *denied* the motion for summary judgment, holding that "Under [Medicare] Part B, providing different services to multiple patients at the same time is deemed group

13

therapy, *unless the therapist or therapy assistant tracks identifiable episodes of one-on-one treatment.*" *U.S. ex. rel. Johnson*, 223 F.Supp. 3d at 900 (emphasis added).

Relator alleges there was no back and forth treatment, plain and simple. She alleges there was co-signing without co-treating. In short, she alleges therapists were urged to and did co-sign, stating they provided treatment or supervised exercises when they had not. She also alleges false billing for individual treatment that had actually been performed as group treatment by recording the treatment of some of the patients had occurred at different times on the schedule when it had not occurred. She provides evidence of the manipulation of the schedule. Just as it denied summary judgment in the "group therapy" case before it, the *Johnson* court would surely deny the motion to dismiss here. Even though *Johnson* recognized that the Medicare rules in other circumstances allow therapists to track identifiable episodes of one-on-one treatment, that is no support to dismiss this matter on the pleadings. Defendants' Motion proceeds on the same theory that the managers and billing personnel at Hale and USPT did: if their employees *record* something occurred, even if it did not, the billing is permissible. It is, of course, the substance, not the form, that matters.

Defendants decry Relator for making improper legal conclusions, arguing what she witnessed was lawful billing. This is not so. Relator provides factual allegations of ultimate facts or indicia of fraud, without impermissible *ipse dixit.* It is a factual allegation, not a *legal* conclusion, to allege front desk personnel, who did not treat *at all*, co-signed falsely attesting to treatment of non-government patients who were being treated by a therapist simultaneously treating a government patient, thereby freeing up the therapist to falsely bill the Government for individual treatment. It is factual allegation,

14

not a *legal* conclusion, to allege therapists co-signed for treating patients when they did not in fact provide any treatment or supervision of them *at all*.  It is a factual allegation, not a *legal* conclusion, to allege therapists billed for individual therapy when they *in fact* treated patients in groups with no back and forth treatment.  It is a factual allegation, not a *legal* conclusion, to allege the many ruses devised to show patients had not been treated simultaneously (such as falsifying the official schedule so that it appeared that some patients were treated at other times when it was simultaneous with others), when in fact they had been.

### 2.  No Equally Plausible Explanations Exist.

Defendants argue from cases in which providers exploited legitimate profits or in which physicians were encouraged to perform certain medical procedures for innocent reasons, that, likewise, Relator alleges activity with an innocent motive.  *See* Motion at 10-11 citing *U.S. Baylor v. Scott & White Health*, 2019 WL 3713756 (W.D. Tex. Aug. 4, 2019) and *U.S. ex rel. Bennet v. Medtronic, Inc.*, 747 F.Supp. 2d 745 (S.D. Tex. 2010).  But alas, there are simply no reasonable, plausible, rational explanations for the many ruses that Defendants employed.  If the Defendants had, in fact, actually avoided group treatment of patients, then why would they need to create false records?[7]

---

[7] Faced with allegations creating a strong inference of fraudulent billing, Defendants try to characterize it as *de minimus*, so small as to be implausible.  *See* Motion, note 17.  But when the Drayer Physical Therapy Institute, which operates fewer than 1/3 the number of clinics that USPT does, was caught doing the same thing, it settled for $7 million.  *See Drayer Physical Therapy Institute, LLC Settle False Claims Act Case for $7,000,000* at https://www.justice.gov/usao-sc/pr/drayer-physical-therapy-institute-llc-settle-false-claims-act-case-7000000.  Further, the $80 figure cited as the *de minimus* damage estimate for the Melbourne clinic in note 17 appears to be invented by Defendants.  Exhibit K to the Complaint shows that Relator estimated the daily fraud at the Rockledge clinic (in the period *after* the introduction of the group code) to be $217; that the

To be clear, Relator is not alleging that avoiding the group charge by actually treating patients individually is fraudulent. Relator agrees that maximizing profits is not illegal. Relator alleges, rather, that Defendants did not treat individually, but billed as though they had. Defendants also argue that, because the Complaint alleges Defendants sometimes employed the group code, it necessarily follows they never falsely avoided it. Motion at 10. But the conclusion simply does not follow from the premise. The group code was sometimes used because there are only so many hours in a day. The Complaint alleges the schedule was maintained in a way to make it look as though patients who overlapped in fact did not overlap, but in the end, if there were more patients still, some would have to be billed as overlapping.

Further, Defendants cite to paragraphs 41 and 42 of the Complaint for the proposition that Relator "is fundamentally wrong by alleging the eight minutes must be *consecutive . . .*" Motion at 11 (emphasis provided in Motion). But the Complaint does not contain the word "consecutive". Relator does not misunderstand the regulations; in fact, the Complaint does not depend on a technical interpretation of the regulations. Rather, Relator alleges therapists to whom co-treatment was attributed (through co-

---

Melbourne clinic was approximately triple the size of the Rockledge clinic; and that they were together just 2 of 500 the clinics. The resultant $56,000,000 in annual overcharging is not *de minimus*, even for a company with $417,000,000 in net patient revenues (*see* Form 10K at https://www.sec.gov/Archives/edgar/data/885978/000114036119005059/brhc10000168x1_10k.htm#tBUS), and definitely not for the U.S. taxpayer. The Complaint also alleges and provides documentary support for three representative days showing that "18 of the 40, or 45%, of the billed Medicare or Medicare-related visits for those three days were improperly billed". Complaint ¶ 101. Allegations that for years Defendants did not employ the group code *at all*, and that when they started to, they still falsely charged 45% of the time, resulting in $56,000,000 in overbilling, are far from *de minimus*.

signing) did not *in fact* co-treat. She alleges the many ruses employed so that patients who were in fact co-treated appeared to have been treated at totally different times, so that it would appear that they did not overlap at all. There simply is no plausible, legal explanation for the facts that Relator alleges.

### 3. The Notion That USPT Instructed and Encouraged Hale Employees, But Not the Employees at its Other Clinics, to Bill Falsely Defies Plausibility.

As has been shown, the Complaint alleges significant control by USPT on the billing process, on billing personnel, over the front desk processes where many of the ruses played out, and on specific issues and instances. *See* Section IV.A.3. above and Complaint ¶¶ 84-98. It would defy credulity to think that USPT directed a scheme to overcharge only at one or two of its clinics. And, the argument that the other clinics have physical therapists, not occupational therapists (Motion, n. 7) is a red herring. The Group Therapy Services Code (97150) has long applied to both "outpatient physical therapy services . . . and outpatient occupational therapy services." Carriers Manual Transmittal 1753, dated May 17, 2002. In fact, *Drayer* concerned physical therapists billing individually for group treatment that should have been billed under code 97150.

### 4. Relators Knowledge, Combined with the Documentary Evidence, Constitute Particularized Allegations Satisfying All Pleading Rules.

Defendants' arguments (Motion at 13-17) that the Relator lacks personal knowledge of submitted claims, and that the Complaint lacks particularity, is conclusory, and is based on information and belief, do not hold water. As has been shown above, Relator certainly alleges the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted", as is required in the Fifth Circuit. *Grubbs*, 565 F.3d at 185-86 (5th Cir. 2009). In a case

that is particularly persuasive because it applies the Fifth Circuit's instruction in *Grubbs*,

the Second Circuit explained that allegations of presentment of false claims is necessary,

but explained that particularized allegations of a scheme to falsify records supports a

strong inference of the presentation of false claims.  It stated:

> As the Fifth Circuit has explained, [s]tanding alone, raw bills — even with numbers, dates, and amounts — are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work. It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.  *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). Accordingly, [Relator] has sufficiently pled the allegation, critical to stating an FCA *qui tam* claim, that records were in fact falsified.

> He must *also* plead, however, that the false records were actually presented to the government for reimbursement. As noted above, although [Relator] puts forth particularized allegations of a scheme to falsify records, and describes specific instances of the implementation of that scheme, he does not — and, for reasons set forth above, he cannot — allege on personal knowledge (of himself or of [his co-Relator]) that false claims were submitted to the government. We conclude, however, that the TAC sets forth facts supporting a strong inference that they were.

*United States ex rel. Chorches v. Am. Med. Response, Inc*., 865 F.3d 71, 84 (2d Cir.

2017).

Further, the fact that Relator makes some allegations on "information and belief"

is totally proper.  *Chorches* relates as much in a section with a telling heading:

> 3. *Permitting Pleading on Information and Belief on These Facts is Consistent with the Purposes of Rule 9(b) and of the False Claims Act.*

> In applying Rule 9(b) to the submission of false claims under subsections 3729(b)(2)(A) and (B) of the FCA, we decline to require that every *qui tam* complaint allege on personal knowledge specific identified false invoices submitted to the government.  As set forth above, a complaint can satisfy Rule 9(b)'s particularity requirement by making plausible allegations creating a strong inference that specific false claims were submitted to the government and that the information that would permit

further identification of those claims is peculiarly within the opposing party's knowledge.

*Id.* at 86. The Relator in *Chorches* was an ambulance driver, who, like Relator here, was made to falsely document the work he performed. Neither is employed in the billing department, but there is little doubt of the purpose of the false documentation in either case. Alleging on information and belief facts flowing from facts personally known in both cases is proper. Defendants rely on the pre-*Grubbs* cases of *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.* 125 F.3d 899, 903 (5th Cir. 1997) and *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683-84 (7th Cir. 1992) for the proposition that pleading fraud allegations on information and belief is generally improper. Motion at 16. *Grubbs's* allowance of pleading from inferences necessarily allows for information and belief pleading. Plaintiff certainly alleged the facts supporting the beliefs. *Cf. U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F.supp. 2d 709 (N.D. Tex. 2011) (relator failed to make allegations of the facts supporting the belief.)

Finally, Defendants' arguments that Relator admits that she lacked knowledge of any particular claim submission, or that she lacked knowledge of the conspiracy afoot fails. (see Motion at 17, 19-20) She alleges that she educated herself concerning the conspiracy to submit false bills[8], and alleges communication between USPT and Hale

---

[8] 47. Ms. Elsdon initially believed that her supervisors would not do anything illegal. Further, she was not aware of what was and was not submitted to the Government. 48. Nonetheless, Relator voiced concern to Whitney Greene about the incorrect coding alleged herein. Whitney Greene told Ms. Elsdon that the only way to keep paying all of the staff was to continue these billing practices and reassured Ms. Elsdon that they were being thorough in their efforts to create records that would prevent any issue with the Government. Suzanne Hale also stated to Ms. Elsdon on multiple occasions that co-signing without truly co-treating would be "okay" since they are all in the same room and that using the group charge would make it very hard for her to keep paying her staff. On

sufficient to support a claim of conspiracy.  *See* Section IV.A.3. above and Complaint ¶¶

84-98.

## V.  CONCLUSION

For the reasons stated herein, the Motion should be denied.

Respectfully submitted,

**DAVID S. TOY PLLC**

*/s/ David S. Toy*
David S. Toy
Texas SBN 24048029 / SDTX ID 588699
4309 Yoakum Boulevard, Suite 2050
Houston, TX 77006
Telephone:        832 521 1414
Facsimile:        832 521 8242
Email:             david.toy@dstpllc.com

<u>**OF COUNSEL:**</u>
**DO CAMPO & THORNTON, P.A.**
John Thornton (admitted *pro hac vice*)
Chase Bank Building, 150 S.E. Second Ave., Ste. 602
Miami, FL 33131
Telephone:        305 358 6600
Facsimile:        305 358 6601
Email:             jt@dandtlaw.com           ***Attorneys for Qui tam Plaintiff***

---

information and belief, Suzanne Hale in fact knew that co-signing without co-treating
was not legal.
49.  These statements confirmed to Relator that the incorrect codes that the therapists
were recording were in fact being used to bill the Government, and that the procedure
was company-wide.  Further, she realized that the only possible purpose of the incorrect
coding was to submit false claims to the Government; that the documents incorrectly
stating the treatment times and/or containing incorrect CPT codes were submitted to the
Government, and/or that they were being used as backup support for false claims that
were regularly being submitted to the Government.
50. From her position inside the business, Relator took steps to further understand the
billing process; to document that false submissions were being made; to document the
scope and frequency of the fraudulent activity; and to confirm and further understand the
fraudulent means that Defendants employed.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing was automatically accomplished on all counsel of record through the CM/ECF Notice of Electronic filing, in accordance with the Federal Rules of Civil Procedure on this 26th day of November, 2019.

_/s/ David S. Toy_
David S. Toy